UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TREVELYN ENTERPRISES, LLC | * | CIVIL ACTION NO. 18-11375 |
| | * | |
| VERSUS | * | SECTION: "S"(1) |
| | * | |
| SEABROOK MARINE, LLC, ET AL. | * | JUDGE MARY ANN VIAL LEMMON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

Before the Courts is the Motion for Protective Order and Sanctions filed by plaintiff Trevelyn Enterprises, L.L.C. ("Trevelyn"). (Rec. Doc. 35). Oral argument was held on July 29, 2020, and the court GRANTED the motion. The court hereby provides written reasons for its ruling.

Background

This lawsuit concerns repair and maintenance work performed by SeaBrook Marine, L.L.C. ("SeaBrook") on the M/Y FAIR SKIES, a 90 foot yacht owned by Trevelyn, pursuant to a contract entered into on June 5, 2018. This work included painting the bottom hull. Trevelyn alleges that SeaBrook did not perform the work in a workmanlike manner and that SeaBrook also damaged the vessel. Trevelyn invoked this court's admiralty jurisdiction and filed suit on November 21, 2018. SeaBrook answered and filed a counterclaim for unpaid invoices for shipyard services in the amount of $40,039.20. On February 19, 2019, Trevelyn amended its complaint to name New Nautical Coatings, Inc. d/b/a Seahawk Paints ("Seahawk") and Atlantic Specialty Insurance, Inc. as defendants. Trevelyn alleges that it spoke to different hull paint manufacturers, including Seahawk, before SeaBrook painted the vessel. It alleges that the Seahawk representative advised Trevelyn that it would have a representative on site to ensure that SeaBrook applied the

1

primer and top coats in accordance with Seahawk's Technical Data Sheets and that this representation is why Trevelyn chose Seahawk's primer and paint. Trevelyn alleges that Seahawk's representative permitted SeaBrook to apply the primer in a manner that did not meet those requirements and then allowed SeaBrook to apply the paint over the primer in a manner that did not comply with the requirements. As Trevelyn explains in the present motion, a key issue concerns the thickness of the coats of primer and paint applied.

The M/Y FAIR SKIES is presently on blocks at the Pensacola Shipyard in Pensacola, Florida, and Trevelyn's principal Troy Bourque and his wife have been living aboard. The vessel was inspected on March 3, 2020, at which time Trevelyn sent Revel Boulon to inspect the vessel on its behalf, Seahawk sent Tim Ballard to conduct an inspection on its behalf, and Seabrook sent Kyle Smith to inspect the vessel on its behalf. On June 16, 2020, Trevelyn delivered Boulon's expert report to the defendants. Trevelyn's Ex. E, Rec. Doc. 35-6. On June 18, 2020, Seahawk's counsel reached out to Trevelyn's counsel via email, requesting an opportunity to inspect the bottom of the hull. Trevelyn's Ex. F, Rec. Doc. 35-7, at 2. Trevelyn's counsel refused, stating that Seahawk already had an opportunity to inspect the vessel on March 3, 2020, and sent an expert to do so. Id.  Wolf was copied on these emails between counsel for Trevelyn and counsel for Seahawk. Id.  Seahawk's counsel responded that "[t]he reason for the second short visit is due to many issues and opinions provided by Mr Revel Boulon in his recent marine survey." Id. at 1. He explained that the inspection was for a "paint/coatings" expert named Bill Wolf, not a marine surveyor. Id.  Seahawk's counsel responded "Fine lets do it the hard way so you can bill your client for unnecessary legal work. The Court will grant my motion. You and I both know I will win."Id. Trevelyn did not back down, insisting that Seahawk could have sent anyone to inspect on March 3, 2020, and that it would not allow Seahawk a "second bite at the apple." Id.

On June 22, 2020, Mr. Bourque saw a man taking photographs of the hull of M/Y FAIR SKIES. According to Mr. Bourque, he asked the man who he was and said his name was Bill Smith and that he was a boat captain in from Tampa, but without a boat in the shipyard. Afterwards, Mr. Bourque's wife found photos of Bill Wolf and concluded that Bill Smith was actually Bill Wolf. Trevelyn's counsel advised defense counsel that Wolf had been caught inspecting the vessel and proposed the parties enter into a stipulation that defendants would not use any information obtained by Wolf on June 22, 2020, that any photos, notes, samples, etc. obtained by Wolf would be destroyed, and that Wolf would not be called as an expert at trial. Seahawk responded that any photos taken by Wolf were identical to those taken on March 3, 2020, and so Trevelyn had not been damaged. Seahawk also suggested that the shipyard was a public space and Wolf had every right to inspect the vessel without permission from the owner. Trevelyn filed the present Motion for Protective Order and Sanctions on July 9, 2020.

Trevelyn argues that Seahawk has violated Federal Rule of Civil Procedure 34 by inspecting the M/Y FAIR SKIES without formally requesting a second inspection or filing a motion to compel an inspection when Trevelyn resisted. Trevelyn was denied the opportunity to have a representative present during Seahawk's inspection. Trevelyn says it would have asked Seahawk to cover the expense of flying Trevelyn's expert out for a second inspection. It asks that this court sanction Seahawk under Rule 37 and pursuant to its inherent authority by prohibiting defendants from using any photographs, notes, measurements, samples, or other tangible materials ("Tangible Materials") in this litigation; prohibiting defendants from providing any of the information and tangible materials obtained by Wolf on June 22, 2020 to any marine surveyor or expert witness retained by defendants in this litigation and to the extent any information has already been provided, prohibit defendants from relying on such witness at trial; produce any and

3

all Tangible Materials created or obtained by Wolf of June 22, 2020; exclude Wolf as a witness in this matter; and its attorneys' fees and costs.

Trevelyn's motion was set for submission with oral argument on July 29, 2020. Seahawk's opposition memorandum was due on July 21, 2020, but it did not file its opposition memorandum until the end of the day on July 23, 2020. Seahawk opposes Trevelyn and argues that there was no abuse of discovery and no prejudice suffered by Seahawk. It points out that the vessel has been photographed previously and argues that 10-12 digital images by Wolf while the vessel was out in the open does not result in prejudice. It represents that Wolf did not touch the vessel, did not take any paint samples, did not go underneath vessel, and performed no measurements of the vessel's bottom. It says that Wolf stayed outside of the travel lift footprint of the vessel and stayed in the public area of the shipyard at all times. It does not provide a declaration or affidavit to support these representations. Seahawk admits that it requested a second inspection after receiving Boulon's June 2020 report. Seahawk believes Trevelyn's denial was unreasonable considering the vessel was already hauled out on the hard for non-litigation related reasons. Indeed, Seahawk contests Trevelyn's representation that the vessel was hauled out for the March 2020 inspection, insisting instead that it was taken out of the water to repair substantial aluminum bottom plate damage due to interior corrosion, deterioration and/or other wastage. It complains that when the bottom plating was removed, Trevelyn did not safeguard these pieces of evidence for future destructive testing. It suggests it will raise this issue of spoliation in the future. Seahawk argues that Trevelyn had no expectation of privacy while the vessel was open to the public at the Pensacola shipyard. Seahawk describes Trevelyn's motion as "patently absurd and petty."

In a reply filed on July 27, 2020, Trevelyn challenges Seahawk's opposition as untimely. Further, Trevelyn points out that no declaration or affidavit of Wolf has been provided with regard

4

to Seahawk's version of events.[1] Trevelyn challenges Seahawk's characterization of the boatyard as a public space, pointing out that it is located behind a business office and a security guard checkpoint. Mr. Bourque has submitted a Declaration attesting that he checked with the boatyard and Wolf did not check in on July 22, 2020. He also attests that he observed Wolf within the "travel lift footprint," which Trevelyn describes as similar to the lines of a parking spot which reflect the space that Trevelyn was renting from the boatyard.[2] Trevelyn insists that by entering into this space without permission, Wolf committed a trespass.

At oral argument, counsel for Seabrook reported that Wolf did not inspect the M/Y FAIR SKIES at his direction. According to counsel, he merely informed his client that Trevelyn would not allow the inspection and that a motion to compel would be filed; he was unaware of the circumstances under which Wolf went to the vessel anyway. Counsel explained that Wolf is an employee of Seahawk and was not retained as an expert in this matter. Wolf has not been listed as a witness (expert or otherwise) in this matter. When asked why, in light of this, Seahawk did not agree to Trevelyn's proposed stipulation, counsel insisted he found the stipulation to be unreasonable and punitive. When asked if he would consider the stipulation now, he advised he could discuss it with his client. When asked why the photos taken by Wolf had not yet been produced to Trevelyn, counsel stated that Trevelyn had not asked. He also explained that he had not received the photos from his client.

---

[1] Trevelyn's version of events recounted above is supported by a Declaration of Mr. Bourque.
[2] Trevelyn submits Pensacola Shipyard Rules and a form Haulout Agreement reflecting that a vessel owner contracts for the use of the shipyard' crane, travelift, repair, and storage space. (Rec. doc. 39-3).

Law and Analysis

*1. Sanctions*

"If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). Possible sanctions include treating the failure as contempt of court, directing that certain facts be taken as established for purposes of the action, or prohibiting a disobedient party from opposing designated claims. Id. Even where no court order is in effect, courts have found that Federal Rule of Civil Procedure 37 authorizes the imposition of sanctions where a party engages in abusive litigation practices like "coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system." Quela v. Payco-Gen. Am. Creditas, Inc., No. 99 C 1904, 2000 WL 656681, at *6 (N.D. Ill. May 18, 2000). "Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, [a court] can properly consider the sanctions available under Rule 37." Additionally, the court has inherent authority to sanction abuses of the judicial process. Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991); see Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc., 2 F.3d 1397, 1407–08 (5th Cir. 1993). The court's discretion to fashion the appropriate sanction must be exercised with restraint. Chambers, 501 U.S. at 44.

Rule 34(a)(2) provides that a party may request, within the scope of Rule 26(b), "to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it." Fed. R. Civ. P. Rule 34(b) lays out the procedure for making such a request, which must, among other things, specify a reasonable time, place, and

manner for the inspection. Id. R. 34(b)(1). Procedures for objections are also provided. Id. R. 34(b)(2).

Trevelyn cites Baugus v. CSX Transportation, Inc., in support of the imposition of sanctions here. 223 F.R.D. 469 (N.D. Ohio 2004). There, the plaintiff sought to introduce a video of himself and two others performing activities similar to those required to load and unload railcars, which had been taken after the plaintiff's injury but before he filed suit. Id. at 470. Permission had not been obtained from the owner of the siding on which the cars were located or from the defendant who had placed the cars at that location. Id. The court found that Rule 34(a)(2) is intended to prevent this type of surreptitious undertaking by requiring certain safeguards, notably allowing the other side to be present and have the assistance of counsel. Id. at 470-71. It explained that Rule 34 also enables the court, rather than a single party, to decide whether to permit entry and, if so, set conditions to balance the search for truth with the burdens and dangers created by the inspection. Id. at 471. The court excluded the video, finding that plaintiff's deliberate, if unknowing, effort to bypass the provision of Rule 34(a)(2) "should not be allowed to succeed." Id.

Seahawk distinguishes Baugus, pointing out that it involved pre-suit surreptitious filming on private property insisting that here, "the digital images taken by Mr. Wolf were taken post-suit of the vessel's bottom from a public area of the Pensacola shipyard. Importantly, as indicated above, Mr. Wolf took no paint samples, took no measurements and performed no other testing, destructive or otherwise during this visit. He simply took a few digital images which should be identical to the hundreds of images taken by the previous surveyors in the March 2020 bottom inspection. This situation creates no prejudice to plaintiff whatsoever."

2. *Wolf's "Inspection"*

The actions of Seahawk in sending Wolf to inspect the M/Y FAIR SKIES violates its discovery obligations. The procedure of Rule 34 should have been followed, but it was not. The characterization of a private shipyard as public property is misleading. Wolf did not have the permission of the shipyard to enter, nor did he have the permission of Trevelyn to go within the travel lift footprint.

Seahawk attempted to obtain permission for the inspection, and when Trevelyn refused, it threatened a motion to compel. It should have pursued a motion to compel so that the court could have determined the propriety of a second inspection and the parameters of any such inspection. If timing was an issue, expedited hearing could have been requested. In fact, this is the type of issue that the parties could have brought to the court's attention for a telephone conference. Instead, after requesting an inspection and learning that Trevelyn would like to have a representative present in any event, Seahawk sent Wolf (or Wolf, a Seahawk employee, took it upon himself) to take photos without Trevelyn's permission or knowledge. Apparently Seahawk did so without authorization of its counsel.[3] Seahawk now claims there was no prejudice because Wolf merely took less than 12 photos, the vessel has been previously photographed, and the later photos are similar to the earlier. If that is so, why did Wolf need new photographs? Seahawk's actions were, under the circumstances, inappropriate and in violation of its discovery obligations.

As to the appropriate sanctions, the court must tailor the sanctions to the discovery abuse. The court finds Trevelyn's request entirely reasonable under the circumstances. Importantly, it appears that Wolf was never intended to be called as an expert witness. The sanctions as issued at

---

[3] In light of counsel's representation that he did not direct Wolf to inspect the M/Y FAIR SKIES, this is less of an issue of counsel's failure to meet his professional obligation. However, the court remains concerned that when counsel learned of the surreptitious inspection from Trevelyn, the response was surprisingly and inappropriately defensive, evasive, and even accusatory, when it should have been candid, conciliatory, and cooperative.

oral argument and recounted below are intended to place Trevelyn back in the position it was in before the unauthorized inspection occurred.

Conclusion

For the foregoing reasons, the Motion for Sanctions is GRANTED:

1) Seahawk shall produce to the plaintiff a declaration or affidavit of Bill Wolf regarding what he did and did not do during the unauthorized June 22, 2020 inspection, including specifically whether any measurements were taken, whether any samples were taken, whether any notes were taken, and whether anything other than photos was taken.

2) No photographs, notes, measurements, tests, samples or any other tangible materials, facts, information and opinions of any kind concerning M/Y FAIR SKIES created and/or obtained by Bill Wolf on June 22, 2020 will be used by any employee or owner of Seahawk or SeaBrook Marine, L.L.C. ("Seabrook") in this litigation.

3) The information and tangible materials obtained by Bill Wolf on June 22, 2020 will not be provided to any marine surveyor or expert witness retained by either Seahawk or Seabrook in this litigation. To the extent that such information and tangible materials have already been provided to any marine surveyor or expert witness retained by Seahawk and/or Seabrook, this information may not be used or relied upon by these witnesses in this litigation. Seahawk's counsel shall determine whether anyone has received such information and/or tangible materials and, if so, shall ensure that the information and materials are returned and destroyed. Seahawk's counsel shall provide a certification to plaintiff that this effort has been undertaken and completed.

4) Any and all photographs, notes, measurements, samples, and any other tangible materials created or obtained by Bill Wolf on June 22, 2020 concerning M/Y FAIR SKIES shall be destroyed.

5) Bill Wolf may not be called as a witness at trial of this matter.

6) Seahawk shall pay plaintiff's reasonable attorney's fees and costs associated with bringing this motion. Plaintiff shall file into the record an affidavit attesting to such attorneys' fees and costs, with such affidavit to include the hourly rate(s) and hours billed along with time entries reflecting billing judgment. Privileged information may be redacted from the time entries.

New Orleans, Louisiana, this  3rd  day of August, 2020.

                                        Janis van Meerveld
                              United States Magistrate Judge